**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CRYSTAL SPRINGS SHIRT CORPORATION, Bernstein and Sons Shirt Corporation, Respondents.**

No. 80–3110.

United States Court of Appeals, Fifth Circuit. Unit A

Feb. 19, 1981.

Elliott Moore, Deputy Associate Gen. Counsel, William A. Lubbers, John E. Higgins, Jr., Robert E. Allen, N.L.R.B., Washington, D.C., Charles M. Paschal, Jr., Regional Director, Region 15, N.L.R.B., New Orleans, La., Meredith K. Wellington, John D. Burgoyne, N.L.R.B., Washington, D.C., for petitioner.

Friday, Eldredge & Clark, James W. Moore, Oscar E. Davis, Jr., Little Rock, Ark., for respondents.

Before INGRAHAM, GEE and TATE, Circuit Judges.

INGRAHAM, Circuit Judge:

Pursuant to section 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e) (1976), the National Labor Relations Board (the Board) seeks enforcement of its order issued against Crystal Springs Shirt Corporation and Bernstein & Sons Shirt Corporation (collectively Crystal or the Company).[1] The Board, adopting the findings and conclusions of an Administrative Law Judge (ALJ), ruled that Crystal had engaged in unfair labor practices in violation of sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (5) (1976), by unilaterally changing piece rates and production quotas, without notifying or bargaining with the certified collective bargaining representative, commencing in May 1977 at its garment factory in Crystal Springs, Mississippi.[2] The Board further found that a strike by Crystal's employees in April 1978 was called in response to Crystal's unfair labor practices and therefore constituted an unfair labor practice strike. Accordingly, the Board entered a broad cease and desist order on September 28, 1979.[3] We enforce that order.

---

1. The Board's decision and order are reported at 245 NLRB No. 112 (Sept. 28, 1979).

2. The Board also ruled that Bernstein & Sons and its wholly owned subsidiary, Crystal Springs, constitute a single employer for purposes of the act. This ruling, manifestly supported by substantial evidence on the record as a whole, is not challenged by Crystal in this appeal.

3. The Board's order requires the Company to cease and desist from engaging in the unfair labor practices found and from in any other manner interfering with the employees' Section 7 rights. Affirmatively, the order requires the Company to comply with the following terms: (1) upon request, to bargain with the Union as the exclusive bargaining agent and, if an understanding is reached, to embody it in a signed agreement; (2) upon request, to furnish the Union with all records necessary and relevant to the Union's decision whether to restore the piece work rates and production quotas in effect prior to May 1977; (3) if the Union so desires, to revoke the unilateral changes in

## The History of the Case

In June 1974 the Amalgamated Clothing and Textile Workers Union, AFL–CIO–CLC (the Union) was certified as the bargaining representative for a unit of Crytal's production and maintenance employees. The parties began negotiations in September 1974. From then until December 1975 the parties met twenty times without agreeing on a contract. At the last meeting, Crystal submitted its final proposal on a take-it-or-leave-it basis. The Company offered wage increases in return for the Union's acceptance of certain other Company demands and abandonment of certain Union demands. The Union asked for further meetings on the proposal, but Crystal declared that the parties were at impasse. Twenty-five minutes after the December 1975 meeting ended, Crystal unilaterally announced to the plant employees its proposed wage increases and thereafter implemented them. In response, the Union filed unfair labor practice charges. In April 1977 the Board found that Crystal had engaged in surface bargaining with no intention of entering into any final binding collective bargaining agreement and had made unilateral changes in wages in violation of sections 8(a)(1) and (5) of the Act.[4]

In May 1977 the Union formally requested that Crystal resume negotiations. It also asked the Company to provide information on total earnings during a representative period for all employees in the bargaining unit. From this wage and piece rate data, the Union negotiator made certain wage analyses. After the hiatus of over eighteen months, Crystal and the Union sat down again in July 1977. At the next meeting, in September 1977, Crystal gave the Union negotiator additional data showing total earnings summaries and piece rates then in effect at the plant. The Union negotiator complained that the data showed that the Company had converted from production mostly of woven goods entirely to knit goods and also had made changes in the piece rates and production quotas. In October 1977 the Union once again filed unfair labor practice charges against Crystal, alleging violations of sections 8(a)(1) and (5) of the Act.

In February 1978 the Union called a meeting of Crystal employees. Union personnel discussed with the employees the history of negotiations with the Company over the past three and one-half years, including the fact that the Company had engaged in surface bargaining and, most recently, had implemented unilateral changes in piece rates and production quotas when it changed from woven production to knit. The Union personnel also explained the difference between an economic strike and an unfair labor practice strike. Thereafter, the employees voted unanimously to authorize the Union to call a strike against Crystal. After one month of preparations, the employees struck in April 1978.

■ In this application for enforcement, our standard of review is to determine whether there is substantial evidence on the record as a whole to support the Board's findings. *Universal Camera Corp. v.*

piece work rates and production quotas instituted in May 1977, and to restore the rates of pay and quotas in effect prior thereto, making employees whole for any loss they may have suffered by reason of the unlawful changes; (4) to preserve and, upon request, to make available to the Board and its agents for examination and copying, all records relevant and necessary to a determination of the amounts due employees; (5) upon application, to offer all employees who struck on April 3, 1978, or thereafter, full and immediate reinstatement to their former positions or, if those jobs no longer exist, to substantially equivalent positions without prejudice to their seniority or other rights and privileges, dismissing, if necessary, any em-

ployee hired after April 3, 1978; (6) to make strikers whole with interest for wages lost commencing five days after unconditional offers to return to work are made until reinstatement is offered, less net interim earnings; and (7) to post customary notices.

4. *Crystal Springs Shirt Corp.*, 229 NLRB 4 (1977). Crystal consented to the entry of a court judgment; this court entered a judgment enforcing the Board's order on September 11, 1978. (No. 78–2148) Unlike the changes in piece rates and production quotas at issue in the present appeal, the wage increases in that case involved changes in the base rates.

*NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is not our function to overturn the Board's choice between two equally plausible inferences from the facts, if the choice is reasonable, even though we might reach a contrary result if deciding the case *de novo*. *NLRB v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). Acknowledging these principles, Crystal argues that the challenged changes did not violate sections 8(a)(1) and (5) of the Act and that, even if they did, the strike was not called in response to those changes and therefore was not an unfair labor practice strike.[5] We turn now to an examination of each of these arguments.

### The Section 8(a)(1) and (5) Violations

It is undisputed that during the last three quarters of 1977, Crystal unilaterally changed certain existing piece rates and production quotas. Conceding this, Crystal attempts to justify its conduct on two grounds. First, Crystal argues that the Union knew or should have known of the changes long before the September 1977 meeting because of certain data previously furnished to the Union. From this notice premise, Crystal argues that the Union waived its right to negotiate over the changes. Second, Crystal argues that even if the Union did not receive notice of the changes, the changes were permissible since they were automatic responses to changes in the underlying job requirements and served only to maintain the status quo.

In support of its notice contention, Crystal points to two occasions on which it provided the Union with certain information relating to piece rates. The first of these was in January 1977 following a negotiating session between counsel for Crystal and the Union negotiator concerning a different plant not involved in these proceedings. Although the data do indicate that there was a piece rate for knit fabric in existence at Crystal during December 1976, there is no indication whatsoever that significant production—or indeed any production—of knit garments was actually taking place.[6] The second occasion in June 1977, was in response to the Union's request for bargaining data, including a complete set of current piece rates, to be used at the July 1977 resumption of negotiations. This material also failed to give any indication whatsoever of the degree to which Crystal was converting to knit production and implementing corresponding piece rate and production quota changes.[7] Because of the difference in graphic presentation, moreover, it is impossible to correlate the two sets of data in any manner that would give notice of changes in particular rates. These disclosures, charitably so characterized, do not constitute "circumstances which afford a reasonable opportunity for counter arguments or proposals." *See NLRB v. Citizens Hotel Co.*, 326 F.2d 501, 505 (5th Cir. 1964). "Notice, to be effective, must be given sufficiently in advance of actual implementation of a decision to allow reasonable scope for bargaining.... Notice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated." *International Ladies' Garment Work-*

---

5. Crystal also objects to the terms of the Board's remedy. The Company asserts in a conclusory manner that the make-whole remedy gives to the Union a veto over a substantive condition of employment, namely the setting of piece rates and production quotas. Since before the Board Crystal did not except with any specificity whatsoever to the ALJ's proposed remedy, we decline to entertain this objection now. *See* 29 U.S.C. § 160(e) (1976); *NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 322, 82 S.Ct. 344, 347, 7 L.Ed.2d 312 (1961); *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 350, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953); *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255–56, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943).

6. It is undisputed that prior to the period at issue here the bulk of Crystal's production consisted of woven garments. For example, Crystal introduced records before the ALJ that seem to indicate that knit production first began during the last week of October 1976.

7. In fact, a simple tally indicates that approximately 70% of all discreet rates listed were for operations performed on woven fabric. At the hearing before the ALJ, however, Crystal introduced records indicating that as early as first week of April 1977 approximately two-thirds of the operators were performing knit work as opposed to woven.

*ers Union v. NLRB*, 463 F.2d 907, 919 (D.C. Cir.1972). Thus, the information presented to the Union at the September 1977 meeting, which was in a format allowing direct comparison with the rates shown in the June material and which showed rates for operations exclusively on knit fabric, gave the Union its first real notice that Crystal had unilaterally implemented changes in existing piece rates and production quotas. Accordingly, Crystal's waiver argument is without merit.

■ We next must determine whether these changes were permissible as merely responsive to changes in the underlying job requirements serving only to maintain the status quo. We are mindful that Crystal "carries a heavy burden of proving that such adjustments of wages ... are purely automatic and pursuant to definite guidelines." *NLRB v. Allis-Chalmers Corp.*, 601 F.2d 870, 875 (5th Cir. 1979). The origin of this defense is the Supreme Court's decision in *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). In *Katz*, the Court implied that unilateral wage changes that "in effect, were a mere continuation of the status quo" would not constitute a violation of section 8(a)(5). *See id.* 746, 82 S.Ct. at 1113. The protection of this defense, however, runs to wage changes that are "in fact simply automatic increases to which the employer has already committed himself." *See id.* The Supreme Court rejected the status quo defense in *Katz* because the wages challenged there "were in no sense automatic, but were informed by a large measure of discretion." *Id.* We think the same must be said of the changes in piece rates and production quotas challenged here.

Crystal asks us to distinguish this case from one involving the unilateral introduction of new base rates or modification of existing base rates, which Crystal concedes would be a discretionary change.[8] The Company argues that its use of time and motion studies to determine the new piece rates and production quotas for knit fabrics insulates those changes from a finding of

section 8(a)(5) violation—in other words, that application of the scientific method somehow removes the element of discretion. We disagree.

■ The piece rate is the price Crystal pays an employee for performing a dozen repetitions of a certain operation. The production quota is the number of dozens of such operations that a so-called "100% worker" can perform in one day. The piece rate is mathematically computed in such a manner that the 100% worker will earn, for all pieces produced in a day, an amount equivalent to the base rate, expressed as a per hour wage, multiplied by the eight hours of the standard work day. Thus, the establishment of a production quota directly affects the amount that the 100% worker can earn each day. But the establishment of that production quota is itself a discretionary choice. It involves breaking down the entire production process into discrete operations, each composed of certain elements of physical motion. It involves selecting the number of repetitions to be timed in order to arrive at an average time per operation. It involves applying a performance rating to the timed average based on the timer's estimation of the operator's output efficiency. It involves making some allowance for the clerical and bundling time necessarily spent by any operator. All of these estimations and calculations must be performed in order to establish the average time that the 100% worker should spend on a given operation.

Next, the available work time in the day is divided by the average time spent on each operation in order to determine how many operations the 100% worker will accomplish—that is, the production quota for that operation. But this determination is also influenced by discretion. The 480 minute day is first reduced by an amount that represents time spent on breaks. The remaining time is further reduced by an amount that compensates for physical fatigue and machine delay. Thus, Crystal computes its production quotas on the basis

**8.** *See* case cited note 4 *supra*.

of a 391 minute day. In the light of the divers judgmental elements outlined above, we find that the piece rate and production quota changes instituted by Crystal through the use of time and motion studies "were in no sense automatic, but were informed by a large measure of discretion." *NLRB v. Katz,* 369 U.S. at 746, 82 S.Ct. at 1113.

Finally, we note that these unilateral changes in piece rates and production quotas manifestly did not serve to maintain the status quo. In fact, workers generally experienced significant increases in earnings. By Crystal's own admission, from the third quarter of 1976 to the fourth quarter of 1977, 77% of the piece work operators experienced increases in earnings, 18% of them experienced decreases in earnings, and 5% experienced no change. These results can hardly be characterized as maintenance of the status quo. In his opening remarks to the ALJ, counsel for Crystal seemed to argue that these general wage increases somehow exonerated the Company's conduct. On the contrary, we conclude that Crystal unilaterally instituted changes in piece rates and production quotas in derogation of the Union's right to negotiate over wages. *See also Waycross Sportswear, Inc. v. NLRB,* 403 F.2d 832, 835–36 (5th Cir. 1968); *McGraw-Edison Co. v. NLRB,* 419 F.2d 67, 77 (8th Cir. 1968).

### The Unfair Labor Practice Strike

■ Crystal argues that even if we find substantial evidence to support the Board's finding that the unilateral changes violated sections 8(a)(1) and (5), we nevertheless should conclude that the walkout in April 1978 was not an unfair labor practice strike. "A strike is characterized in this way so as to give employees the right to be reinstated if an unfair labor practice had anything to do with causing it." *NLRB v. Safway Steel Scaffolds Co. of Georgia,* 383 F.2d 273, 280 (5th Cir. 1967), *cert. denied,* 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968) (citing *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956)). The result is the same even if the alleged unfair labor practice was only one of multiple causes of the strike. Multiple motivation does not deprive the employees of their status as unfair labor practice strikers so long as the employer's unfair labor practice was a contributing cause. *NLRB v. Pope Maintenance Corp.,* 573 F.2d 898, 907 (5th Cir. 1978).

■ The issue in this portion of the case is one solely of credibility. There is testimony in the record that, immediately prior to the strike vote, Union personnel recounted the long history of labor strife with the Company, the surface bargaining engaged in by the Company, the labor strife at other plants owned by the Company's corporate parent, and the recent unilateral changes in piece rates and production quotas after the changeover from woven production to knit. The ALJ expressly found that testimony credible. The Company attacks the veracity of the testifiant and asks us to reject the ALJ's credibility determination. When the issue is simply one of the believability, the credibility resolutions of the ALJ are entitled to affirmance unless they are inherently unreasonable or self-contradictory. *NLRB v. National Fixtures, Inc.,* 574 F.2d 1305, 1306 (5th Cir. 1978). We find substantial evidence on the record as a whole to support the ALJ's and the Board's finding that Crystal's unilateral changes in piece rates and production quotas were contributing causes of the April 1977 strike.

For the foregoing reasons, the application for enforcement of the order of the National Labor Relations Board should be granted.

ENFORCED.