GULF STATES MANUFACTURING, INC., Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner.

No. 82–4182.

United States Court of Appeals, Fifth Circuit.

May 19, 1983.

James F. Smith, Richard O. Brown, Atlanta, Ga., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Helen L. Morgan, Washington, D.C., for respondent.

Before RANDALL and HIGGINBOTHAM, Circuit Judges, and BUCHMEYER *, District Judge.

* District Judge of the Northern District of Texas, sitting by designation.

**1392**

RANDALL, Circuit Judge:

This case involves a petition for review and a cross-application for enforcement of an order of the National Labor Relations Board. The Board found that the company, Gulf States Manufacturers, Inc., had committed unfair labor practices by (1) denying an employee his right to union representation at an interview where the company sought facts to support disciplinary action, and (2) on two occasions deciding to lay off employees without giving the union an opportunity to bargain over the decision. We enforce the findings of unfair labor practices, but deny enforcement of the back-pay remedy for the layoffs and remand the case to the Board for further findings.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Gulf States manufactures prefabricated metal buildings, a product that is apparently subject to sudden and unpredictable changes in demand. The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers has represented the employees at Gulf States' Starkville, Mississippi, plant since 1975. Labor relations at the Starkville plant have been the subject of earlier litigation before this court, *Gulf States Manufacturers, Inc. v. NLRB*, 579 F.2d 1298 (5th Cir.1978), *modified*, 598 F.2d 896 (5th Cir. 1979) (en banc); that litigation will be discussed more fully in part III.C of this opinion. The current unfair labor practice findings are the results of two wholly unrelated sets of facts.

### A. *The* Weingarten *Issue.*

Vincent Scott, an employee of Gulf States, developed a back problem in February, 1980. He consulted a doctor, who allegedly prescribed medicine that made Scott dizzy. Scott was later assigned to do a job that he believed he should not do because of the dizziness; he refused to perform the work and consequently received a written disciplinary warning on February 13, 1980. Also on February 13, Scott left work early without notifying the supervisor for whom he was to have worked.

The next day, Wayne Eaves, a Gulf States supervisor, told Scott that Production Manager Jerry Schwichtenberg wanted to see Scott. On the way to Schwichtenberg's office, Scott asked Eaves whether Ed Thompson, a Gulf States employee and president of the union local, could be present at the interview. Eaves told Scott that Thompson would not be allowed to attend because the company was not bargaining with the union.[1]

The meeting was attended by Scott, Eaves, Schwichtenberg, and two other Gulf States supervisors. Schwichtenberg told Scott that it had been decided to give him a written disciplinary notice for his failure to remain at work the preceding day. Scott protested that the disciplinary action was motivated by anti-union animus, then proffered an explanation for the early departure: he had left his medication at home. Schwichtenberg asked him why he had not told his immediate supervisor that he was leaving;[2] Scott replied that he had had words with the supervisor earlier in the day and consequently did not wish to speak to

---

1. The company and the union did not have any bargaining sessions between late 1977 and October, 1980. We note, however, that Eaves' response was inappropriate: contract bargaining and *Weingarten* representation are not related functions (except, of course, to the extent that they both implement the employees' right to act collectively). *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 259-60, 95 S.Ct. 959, 964-965, 43 L.Ed.2d 171 (1975) (employee has right to presence of union representative at interview that employee reasonably believes will result in discipline, but company has no duty to bargain with the union representative at the interview).

2. The company challenges the ALJ's finding that Schwichtenberg asked this question, since at the hearing Schwichtenberg denied having asked it. The ALJ resolved a conflict between Schwichtenberg's testimony and Scott's statement that the question was asked by choosing to believe Scott's version. Such a credibility choice is entitled to affirmance unless it is "inherently unreasonable or self-contradictory." *Armstrong Rubber Co. v. NLRB*, 511 F.2d 741, 742 (5th Cir.1975). We perceive no such flaw in the ALJ's determination here.

that supervisor again, and he saw no other supervisors in the area at the time. Schwichtenberg then gave Scott the disciplinary notice, which had been prepared before the meeting, and the interview concluded after several more remarks by Schwichtenberg and Scott. At no time during the interview did Scott repeat his request for union representation.

### B. The Layoff Issue.

Gulf States laid off employees on March 10 and April 8, 1980. Each layoff involved twenty-one people. The company first notified the union of the March layoff ten or fifteen minutes before it occurred. The company knew that there would be a layoff and who would be laid off two days in advance, but it did not provide the union with a list of the affected employees until several days after the layoff. When he was informed of the layoff, the union president, Thompson, inquired if it was by seniority and whether the laid-off workers were subject to recall; both questions were answered affirmatively. Several weeks later, Thompson met with a company official to determine why more senior employees had been laid off while less senior ones had been retained. The company official explained that the layoff had been by seniority within each job classification, not by seniority at the plant, and that the more senior laid-off workers had been in less vital jobs than the less senior retained workers.

The sequence of events surrounding the April layoff was virtually identical to that narrated above. The only respect in which the April layoff differed from the March one was that in April Thompson was not notified of the layoff until after he had observed the laid-off workers turning in their hardhats and identification as they left the plant before the end of their shift.

### C. The Unfair Labor Practice Proceedings.

The union filed unfair labor practice charges based on the Scott-Schwichtenberg interview, the layoffs, and several other occurrences. After a hearing, the administrative law judge found that the company's refusal to allow Thompson to accompany Scott to the interview did not violate section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), as interpreted in NLRB v. J. Weingarten, Inc., 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), because the interview was solely for the purpose of imposing previously-determined discipline. The meeting therefore fell within the exception to Weingarten delineated in Baton Rouge Water Works Co., 246 N.L.R.B. 995 (1979). The ALJ also found, however, that because the company gave the union no opportunity to bargain about the layoffs before they occurred, the company had violated section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) & (1) (1976). The ALJ recommended that the company be ordered to bargain with the union, but he awarded no back pay to the laid-off workers. The ALJ offered this explanation for the latter ruling:

> Under the circumstances of this case and in the absence of evidence showing the Union sought to negotiate over the continuation or termination of the layoffs, but rather it appears sought only to negotiate the manner and means of the layoff and recall, I shall therefore not recommend any backpay as any part of the remedy.

1 Record at 387.

The company and the General Counsel both filed exceptions to the ALJ's opinion and order. The Board reversed the ALJ's finding that the company's refusal to let a union official accompany Scott at his meeting with Schwichtenberg did not violate section 8(a)(1) of the Act. The Board based its finding on its view that the company went beyond merely informing Scott of predetermined disciplinary action when Schwichtenberg asked him why he had left without telling a supervisor. The Board reasoned that the inquiry sought facts to support the disciplinary action, and therefore fell outside the Baton Rouge Water Works exception to the Weingarten rule. Since it found that no disciplinary action had been based on the unlawful interview, however, the Board merely issued a cease-and-desist order.

On the layoff issue, the Board affirmed the ALJ's finding that the company violated section 8(a)(5) and (1), but parted compa-

ny from him over the appropriateness of back pay. Stating that, had there been bargaining, "the employees laid off clearly would have been employed until completion of the bargaining," 1 Record at 402–03, the Board ordered full back pay for each of the laid-off workers from the date of his or her layoff until one of four conditions was met: (1) the company and the union reached agreement on all mandatory subjects of bargaining; (2) good-faith bargaining resulted in a bona fide impasse; (3) the union failed to begin bargaining within five days of receipt of a company request to bargain; or (4) the union failed to bargain in good faith.

The company filed a motion for reconsideration, the General Counsel filed an opposition to the motion, and the company filed a response to the General Counsel's opposition. The Board denied reconsideration. The company then petitioned this court for review of the Board's decision and the Board cross-applied for enforcement.

The company makes five objections to the Board's decision. First, the company contends that the Scott-Schwichtenberg meeting fell within the *Baton Rouge Water Works* exception to *Weingarten,* or alternatively, that Scott did not effectively invoke his *Weingarten* right to be accompanied by a union representative. Next, it contests the finding of a refusal to bargain over the layoffs by offering three separate theories under which it had no duty to bargain: that the layoffs fell within the range of management prerogatives held in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), not to be subject to bargaining; that the union had waived any right it had to bargain on the topic; and that the parties had negotiated to impasse and the company had merely implemented its pre-impasse proposals. Finally, the company attacks the award of back pay as punitive in the face of the company's evidence that the layoffs were economically necessary and thus would still have taken place as they did even if there had been bargaining. We address each contention in turn.

## II. THE WEINGARTEN ISSUE.

In *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), the Supreme Court held that, under section 7 of the Act, 29 U.S.C. § 157 (1976), an employee who reasonably believes that an interview will result in disciplinary action against him or her has the right, upon request, to be accompanied at that interview by a union official. There is no dispute here that Scott reasonably believed that the interview might result in discipline. He had been disciplined on the previous day and had left work early without informing a supervisor.

The company does argue, however, that Scott did not supply the second prerequisite of *Weingarten:* a request for union representation. The company's position is that only Schwichtenberg knew what the scope of the interview would be, so Scott's request to Eaves was insufficient to invoke *Weingarten.* Because Scott never repeated his request to Schwichtenberg, the company contends that no *Weingarten* right arose.

■ This line of argument has a fatal flaw: it is foreclosed by this court's decision in *Lennox Industries, Inc. v. NLRB,* 637 F.2d 340 (5th Cir.), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3113, 69 L.Ed.2d 974 (1981). In *Lennox,* we held that an employee had sufficiently invoked his *Weingarten* right when the supervisor to whom the request was made was present at the interview, even though the company official who conducted the interview was unaware of the request and the supervisor to whom the request was made did not know what the full scope of the interview would be. Here, Eaves was present throughout Scott's meeting with Schwichtenberg; thus, under *Lennox,* Scott's request to Eaves was sufficient to give rise to a *Weingarten* right.

The company's alternative argument rests on the exception to *Weingarten* that the Board established in *Baton Rouge Water Works Co.,* 246 N.L.R.B. 995, 997 (1979):

> [U]nder the Supreme Court's decision in *Weingarten,* an employee has no Section 7 right to the presence of his union representative at a meeting with his employer

held solely for the purpose of informing the employee of, and acting upon, a previously made disciplinary decision.

We stress that we are *not* holding today that there is no right to the presence of a union representative at any "disciplinary" interview. Indeed, if the employer engages in any conduct beyond merely informing the employee of a previously made disciplinary decision, the full panoply of protections accorded the employee under *Weingarten* may be applicable. Thus, for example, were the employer to inform the employee of a disciplinary action and then seek facts or evidence in support of that action . . . , such conduct would remove the meeting from the narrow holding of the instant case, and the employee's right to union representation would attach.

(emphasis in original). This court adopted *Baton Rouge Water Works* in *Anchortank, Inc. v. NLRB*, 618 F.2d 1153, 1166–68 (5th Cir.1980).

■ The ALJ found that the Scott-Schwichtenberg interview fell within *Baton Rouge Water Works;* the Board found that it did not. The company naturally urges that the ALJ was correct, but we must uphold the Board's view if it is supported by substantial evidence in the record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This is the standard of review even where the Board has reversed the ALJ. *Id.* at 496, 71 S.Ct. at 468–469.

■ It is true that Scott apparently initiated the conversation about the circumstances of his early departure and did most of the talking, but nonetheless we cannot say that the Board's finding was not supported by substantial evidence. The ALJ expressly credited Scott's testimony that Schwichtenberg asked him why he had left without informing a supervisor. The Board held that that question, coupled with the nature of the discussion, amounted to an attempt to "seek facts or evidence in support of [the disciplinary] action," *Baton Rouge Water Works*, 246 N.L.R.B. at 997, and thus fell outside the *Baton Rouge Water Works* exception. While this is a

close case, and we might reach a different conclusion if we were deciding the question in the first instance, the Board's interpretation of the conversation is clearly a permissible one.

The company points to the statement in *Baton Rouge Water Works* that "the fact that the employer and employee thereafter engage[ ] in a conversation at the employee's behest or instigation concerning the reasons for the previously determined discipline will not, alone, convert the meeting to an interview at which the *Weingarten* protections apply." Id. at 997. The Board clearly found that Scott's conversation with Schwichtenberg did not fit this description, and there is ample basis in the record for that finding. Scott did instigate the conversation, but the resulting discussion was not confined to an explanation of the reasons for the decision to discipline him; rather, the Board could and did find that Schwichtenberg sought evidence to justify the discipline. The language cited by the company is thus inapplicable.

Since the Board's decision is based on the relevant law and supported by substantial evidence in the record, we find no merit in the company's objections to the ruling that Scott was denied his *Weingarten* right. The company has not objected to the Board's selection of a cease-and-desist order as an appropriate remedy for that violation. We therefore enforce the portion of the Board's order finding that the company's refusal of Scott's request for a union representative violated section 8(a)(1) and ordering the company to cease and desist from such violations.

## III. THE FAILURE–TO–BARGAIN ISSUE.

The ALJ found, and the Board affirmed the finding that the March and April, 1980, layoffs had involved a unilateral change of working conditions without notice to or bargaining with the union, and consequently that the company had violated section 8(a)(5) and (1) of the Act. The company presents us with three independent theories, under each of which it had no duty to bargain with the union over the decision. The first is that the Supreme Court decision

in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), indicates that the layoff decision was a management prerogative not subject to mandatory bargaining. The second contention is that the union waived its right to bargaining. Finally, the company asserts that the parties had bargained to impasse on the layoff issue and the company merely implemented its pre-impasse proposals. We find none of these arguments persuasive, given the circumstances of this case.

A. First National Maintenance.

There is a basic procedural problem with the company's attempt to argue that *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), established that it had no duty to bargain over the layoffs: the company has raised the issue only before this court, not before the Board. Section 10(e) of the Act, 29 U.S.C. § 160(e) (1976), provides: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." It is thus necessary to determine whether the company's failure to make the argument earlier is justified by an "extraordinary circumstance."

The company points out that this court has held that the rendition of the Supreme Court's opinion in *First National Maintenance* was precisely such an extraordinary circumstance. *NLRB v. Robin American Corp.,* 667 F.2d 1170, 1171 (5th Cir.1982) (on rehearing). In *Robin American,* we noted that *First National Maintenance* had overruled previously controlling law that required bargaining over partial closings. *Id.* Because *First National Maintenance* had not been decided until after this court heard oral argument in *Robin American, id.* at 1170, the previous law had still been in effect when Robin American had been before the Board. In light of the fact that "[i]t would have been futile, if not frivolous, for [Robin American] to object before the Board," *id.* at 1171, the failure to object then was excusable.

*Robin American* is, however, easily distinguishable from this case. Here, the ALJ's decision was rendered on January 30, 1981, almost five months before *First National Maintenance* came down on June 22, 1981, but the Board's decision in this litigation was not issued until May 13, 1982, nearly eleven months after *First National Maintenance.* Nevertheless, the company did not raise the issue before the Board, either by a supplement to its objections to the ALJ's decision or in its motion for reconsideration of the Board's decision.

The company argues that *Robin American* does nonetheless control, because a party need not file a motion for reconsideration with the Board as a prerequisite to appeal. For this proposition, it cites *Universal Security Instruments, Inc. v. NLRB,* 649 F.2d 247, 260 (4th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). *Universal Security* held:

> In a case in which the parties have been made aware that an issue would or could be decided by the Board, and the parties have taken the chance to present their sides of the issue to the Board and the Board has issued its decision, the failure to request reconsideration under the regulation does not bar the losing party from citing the issue on appeal.

This case does not involve such a situation: the *First National Maintenance* issue was never raised below. Further, we note that there seems to have been no reason why the company could not have raised the *First National Maintenance* issue in the original Board proceedings by making a supplemental filing with the Board during the eleven months between the *First National Maintenance* decision and the Board's decision in this case. We thus find *Universal Security* and *Robin American* inapplicable here.

The company next falls back on the position that the issue of management prerogative actually was argued before the Board, even though *First National Maintenance* was never mentioned, and thus that we should view the question as having been adequately presented to the Board. We decline this invitation. In the first place, we can find no record that the company did argue management prerogative to the

Board. Further, given the change that *First National Maintenance* wrought in the law, *see Robin American, supra,* 667 F.2d at 1171, and that "[c]onstruing and applying the duty to bargain ... [is a] task[ ] lying at the heart of the Board's function," *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979), we do not think that anything less than a presentation to the Board of the *First National Maintenance* theory itself would have been sufficient to give the Board the opportunity to make the initial exploration of the issues that is the goal of section 10(e).

■ We therefore find no extraordinary circumstance to excuse the company's failure to raise the *First National Maintenance* issue before the Board. We consequently have no jurisdiction to consider the issue. *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).

*B. Waiver.*

■ The company's second defense to the refusal-to-bargain charge is that the union waived its right to bargain over the layoffs by failing to protest them. It is, however, well established that a union cannot be held to have waived bargaining over a change that is presented to it as a *fait accompli.* *NLRB v. Crystal Springs Shirt Corp.,* 637 F.2d 399, 402 (5th Cir.1981). "An employer must at least inform the union of its proposed actions under circumstances which afford a reasonable opportunity for counter arguments or proposals." *NLRB v. Citizens Hotel Co.,* 326 F.2d 501, 505 (5th Cir.1964). *See also International Ladies' Garment Workers Union v. NLRB,* 463 F.2d 907, 919 (D.C.Cir.1972) ("Notice, to be effective, must be given sufficiently in advance of actual implementation of a decision to allow reasonable scope for bargaining .... Notice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated.") (citations omitted). Simply put, a union cannot be found to have waived bargaining when it never had an opportunity to bargain.

■ In this case, the ALJ found that the union first learned of the March and April,

1980, layoffs (and also a layoff in March, 1979, which is not at issue here but on which the company also predicates the waiver argument) fifteen minutes or less before they took effect. Those findings are supported by uncontradicted evidence; it is hard to conceive of a set of facts that show less opportunity for bargaining.

The company has laid great emphasis on *NLRB v. Southern Coach & Body Co.,* 336 F.2d 214 (5th Cir.1964), in which this court found that a company's layoffs of employees without notice to the union did not violate section 8(a)(5) and (1) of the Act. Because of the nature of its business, however, Southern Coach & Body itself did not know that a layoff would be necessary until late in the afternoon of the day of that layoff. *Id.* at 219. The union representative's office was some ninety miles from the plant, *id.* at 216 n. 4; advance notice to the union of layoffs was essentially impossible. In the present case, on the other hand, the ALJ found from the uncontradicted testimony of a company witness that the company knew two days in advance of each layoff in question here both that there would be a layoff and which employees would be affected. There is no element of impossibility in this case.

The evidence does not support the company's waiver defense. We thus move on to the company's final objection to the failure-to-bargain finding.

*C. Impasse.*

The company's final defense to the finding that the layoffs violated its duty to bargain with the union is based on the panel opinion in the earlier *Gulf States* case. *Gulf States Manufacturers, Inc. v. NLRB,* 579 F.2d 1298 (5th Cir.1978), *modified,* 598 F.2d 896 (5th Cir.1979) (en banc). In the portion of the opinion that the company relies on here, the panel rejected a Board finding that a wage increase implemented sometime between February 14 and 20, 1976, without bargaining with the union, was an unfair labor practice. We held that "[t]he wage increase was granted only after a valid bargaining impasse had been reached ...." *Gulf States,* 579 F.2d at

1326–27.[3] The company now seizes upon that impasse finding to excuse the absence of bargaining over the 1980 layoffs.[4] We reject this justification.

At the outset, we note that it is quite doubtful that this issue was properly presented to the Board. The company's objections to the ALJ's report espoused the theory that the company and the union had agreed on layoff procedures in the 1975–76 negotiations and that the 1980 layoffs were in accordance with those procedures. *See, e.g.*, Respondent's Cross-Exceptions to Decision by Administrative Law Judge, 1 Record at 394 ("the layoff section of the seniority policy was a subject of negotiations between Gulf States and the Union over which agreement had been reached"); *see also id.* at 393, 395–97.[5] The impasse issue made its first appearance before the Board in the company's motion for reconsideration.

The Board's regulations provide that "[a] party to a proceeding before the Board may, because of extraordinary circumstances, move for reconsideration ... after the Board decision or order. A motion for reconsideration shall state with particularity the material error claimed ...." 29 C.F.R. § 102.48(d)(1) (1982). It seems unlikely that "extraordinary circumstances" include a party's decision to pursue a new legal theory, when that theory was equally available in the original Board proceedings, nor does it appear to be "material error" for the Board not to decide issues not raised before it. This is particularly true where, as here, evaluation of the theory requires detailed reference to the facts.

The question remains, however, whether the issue was sufficiently raised to preserve it for appellate review even if the Board was justified in refusing to address it. Section 10(e) of the Act, 29 U.S.C. § 160(e), bars only objections that have "not been

urged before the Board ...;" arguably this issue was "urged," however belatedly. Nor does *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982), provide an answer, for there the issue, like the *First National Maintenance* issue here, had never been argued to the Board at all.

While we find it extremely doubtful that the company's presentation of the impasse argument to the Board was adequate to preserve it for appeal, we need not decide the question today, for in any event the impasse defense must fail. The impasse noted in the prior *Gulf States* decision occurred in February, 1976. Between that time and the occurrence of the layoffs in question here, over four years elapsed. During that time, there was a six-day strike in February, 1976; there were further negotiations in 1976, in which the parties moved closer to agreement, *Gulf States, supra*, 579 F.2d at 1315;[6] and the parties negotiated a 1979 wage increase (after the company had implemented its 1976 impasse proposal for wage increases in 1976–78), 1 Record at 382 (Cates, ALJ). The company and the union agreed in 1977 that they would not bargain further until after this court decided the earlier *Gulf States* case, but the panel decision was rendered on September 15, 1978, and the en banc decision on July 10, 1979, still eight months before the layoffs at issue here. In February, 1980, the union won a decertification election. The parties did not resume bargaining until October, 1980.

We do not think that the impasse persisted until the spring of 1980. Whether an impasse exists depends on whether, in view of all the circumstances of the bargaining, further discussions would be futile. *Huck Manufacturing Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982); *Dallas General Drivers, Warehousemen and Helpers, Local Union No. 745 v. NLRB*, 355 F.2d 842 (D.C.

**3.** This finding was adopted by the en banc court. *Gulf States, supra*, 598 F.2d at 905.

**4.** Impasse is a potential defense to a failure-to-bargain charge because, when impasse has been reached after good-faith bargaining, the company is free to implement unilaterally any proposal that it made to the union during the

negotiations. *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982).

**5.** This theory has not been raised before this court.

**6.** This finding was adopted by the en banc court. *Gulf States, supra*, 598 F.2d at 905.

Cir.1966); *Alsey Refractories Co.,* 215 N.L.R.B. 785 (1974); *Taft Broadcasting Co.,* 163 N.L.R.B. 475 (1967), *petition for review denied,* 395 F.2d 622 (D.C.Cir.1968). Anything that creates a new possibility of fruitful discussion (even if it does not create a likelihood of agreement) breaks an impasse: a strike may, *Jeffery-De Witt Insulator Co. v. NLRB,* 91 F.2d 134, 139–40 (4th Cir.), *cert. denied,* 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565 (1937); *Diester Concentrator Co.,* 253 N.L.R.B. 358 (1980); *Transport Co.,* 175 N.L.R.B. 763 (1969); *United States Cold Storage Corp.,* 96 N.L.R.B. 1108 (1951), *enforced,* 203 F.2d 924 (5th Cir.), *cert. denied,* 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 344 (1953); *Arthur A. Borchert,* 90 N.L.R.B. 944 (1950), *enforced in relevant part,* 188 F.2d 474 (4th Cir.1951); *Boeing Airplane Co.,* 80 N.L.R.B. 447 (1948), *enforcement denied on other grounds,* 174 F.2d 988 (D.C.Cir.1949); so may bargaining concessions, implied or explicit, *NLRB v. Webb Furniture Corp.,* 366 F.2d 314, 315–16 (4th Cir.1966); *Diester Concentrator Co., supra; Pillowtex Corp.,* 241 N.L.R.B. 40 (1979); *Goodyear Tire & Rubber Co.,* 217 N.L.R.B. 73 (1975); the mere passage of time may also be relevant, *Jeffery-De Witt, supra* (one month since last bargaining session); *Transport Co., supra* (seven months since last bargaining session).

■ In this case, the 1976 impasse apparently extended to all issues. Since then, there had been successful negotiation on wages, as well as a strike, two decisions by this court, a decertification election won by the union, and the passage of four years' time. Under these circumstances, it seems clear that the impasse did not persist until the spring of 1980, and thus does not excuse the failure to bargain over the layoffs.[7]

We have rejected all of the company's defenses to the finding that the March and April, 1980, layoffs violated its duty to bargain under section 8(a)(5) and (1) of the Act. We therefore enforce the portion of the Board's order that holds that the failures to bargain were unfair labor practices.

## IV. BACK PAY.

As a remedy for the failure to bargain over the layoffs, the Board ordered that the company pay full back wages to all of the laid-off employees for the period from the date of each one's layoff until one of the following conditions is met: (1) the company and the union reach agreement on all mandatory subjects of bargaining; (2) they reach impasse; (3) the union fails to begin negotiations promptly upon request; or (4) the union fails to bargain in good faith. The company vigorously protests the award, alleging that since its economic condition would have required that the layoffs be made at the same times and in the same numbers even had there been bargaining, the award of back pay is punitive.

■ The General Counsel claims that the company never raised this issue before the Board. We disagree. The ALJ denied back pay, so the company had no grounds for objection until after the Board's decision. While it is not a model of clarity, the motion for reconsideration does raise the back-pay issue. *See* Motion for Reconsideration, 1 Record at 409–10 ("[T]he panel has . . . assess[ed] penalties (referred to as remedies) . . . . The panel may continue to prefer [different layoff procedures], but it may not impose such terms by means of a backpay remedy."); *id.* at 415 (avoiding the expense of appellate review in the interest of all parties, "particularly that of Respondent in view of the continued recession which necessitated the 1980 layoffs.").[8] We

---

**7.** We believe that the company's argument is that the impasse persisted throughout the period of the layoffs. The company's briefs are not entirely clear on the matter, however, and it is possible that it is instead arguing that the 1980 layoffs were pursuant to a proposal made to the union during the 1975–76 negotiations and implemented during the 1976 impasse. We also find that argument unpersuasive.

The ALJ found that the company did not follow a consistent layoff procedure, but rather laid employees off by departmental seniority in

1979 and by job classification seniority in 1980. 1 Record at 385. This finding is supported by substantial evidence. Even if the layoffs did all follow the same procedure, there is no evidence showing when the company decided to implement that procedure, so we could not determine whether it was instituted during an impasse. We therefore reject this version of the impasse defense, also.

**8.** The General Counsel filed an opposition to the company's motion for reconsideration, and the company filed a response to the opposition.

therefore proceed to consider the propriety of the back-pay award.

The rule in the Fifth Circuit is that a back pay or restitution order will not be enforced where the result of enforcement would be to put the worker in a better position than he would have been in without the violation. In *NLRB v. Haberman Construction Co.*, 641 F.2d 351 (5th Cir.1981) (en banc), the employer had a prehire contract with a union that had majority support on a particular job; the employer violated the Act by constructively discharging several employees near the end of the job. The Board ordered back pay not only for the remainder of that project, but also for any other project for which the employees would have been hired in the absence of anti-union animus. This court denied enforcement of the back pay order for subsequent projects, because on the facts as found by the ALJ the employees would not have worked on any subsequent project even if the employer had not violated the Act. (This was because the employer could legally make subsequent projects open shop, and the employees in question refused to work in an open shop.) The order for back pay that would have been earned on subsequent projects was thus not a mere return to the status quo ante, but a benefit above what the employees would have received in the absence of any violation and a penalty on the employer.

The employer in *Armstrong Rubber Co. v. NLRB*, 511 F.2d 741 (5th Cir.1975), violated the Act by firing an employee for his union activities. The Board ordered full back pay, but this court demurred. The job for which the employee had been hired was a temporary one, over long before the end of the back pay period; he claimed that he had been promised a permanent job, but neither the Board nor the ALJ had made a finding of such a promise. Confronted with these facts, this court denied enforcement of the order and remanded the case to the Board for a finding on whether there had been a permanent job offer. The court's position was clear that, in the absence of such a finding, the back pay would have to be limited to the period of the temporary job.

This court refused to enforce an order of restitution for a Christmas bonus which was discontinued without bargaining, where it was shown that the company was in such dire financial straits that the bonus would in all probability not have been paid even had there been bargaining and the company had never otherwise obstructed bargaining. *NLRB v. Citizens Hotel Co.*, 326 F.2d 501 (5th Cir.1964). But in *Southern Tours, Inc. v. NLRB*, 401 F.2d 629 (5th Cir.1968), this court enforced a full back pay order to compensate a discriminatorily discharged employee, despite the employer's argument that back pay was excessive because the employee's medical condition would have led to his discharge at the same time. The court rejected that contention because it was satisfied that the Board had made an implied finding that, in the absence of anti-union animus, the employee would have been transferred rather than discharged.

This Fifth Circuit law is generally consistent with that of other circuits. *See Universal Security Instruments, Inc. v. NLRB*, 649 F.2d 247 (4th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (company opened new nonunion plant, eventually closed old unionized plant but allowed workers to transfer to new plant; back pay denied to workers who quit rather than transfer because there was mere failure to bargain, not anti-union discrimination, and because company gave opportunity to transfer); *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596 (9th Cir.

That response raises the back-pay issue explicitly and at length. We can find no authority in the regulations to file such a response, and the fact that the Board did not include it in the record on appeal leaves us in doubt as to the propriety of such a filing. Even if it is proper, we presume that such a response is an inappropriate vehicle for raising an issue not mentioned in the motion for reconsideration. *Cf.*

*Knighten v. Comm'r,* 702 F.2d 59 (5th Cir.1983) (party may not raise in reply brief issues not raised in opening brief); *Ellingson v. Burlington Northern, Inc.,* 653 F.2d 1327, 1332 (9th Cir.1981) (same). We therefore look only to the motion for reconsideration to determine whether the company brought its objection to the back-pay award to the attention of the Board.

1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980) (worker-owned company fired all nonshareholder employees shortly after they unionized; order to reinstate denied enforcement and case remanded to determine truth of company's assertion that would have phased out non-shareholder workers anyway); *Florsheim Shoe Store Co. v. NLRB,* 565 F.2d 1240 (2d Cir. 1977) (company fired all part-time salesmen three weeks after they unionized; court denied enforcement of order for reinstatement and back pay and remanded for findings on whether jobs would have been phased out anyway for economic reasons and whether some employees (e.g., students) would have left jobs voluntarily before end of back pay period).

There thus would be considerable support for denial of enforcement of the back pay order here had there been a finding that the company's economic condition would have led to the employees' being laid off when they were even if there had been bargaining. Such a finding would play the role of the finding in *Haberman* that the employees would have refused subsequent jobs if they had been offered, or the finding in *Citizens Hotel* that the company would not have paid bonuses even if there had been bargaining.

This case, however, is more like *Armstrong Rubber,* for while there is considerable evidence that the layoffs would have occurred even if there had been bargaining,

there is nothing which this court can identify as a finding to that effect in either the ALJ's opinion or the Board's. The Board stated that it was ordering back pay because "the employees laid off clearly would have been employed until completion of the bargaining." 1 Record at 402–03. The Board, however, did not find how long the bargaining would have continued. It also did not find that bargaining would have resulted in an agreement that would have prevented the layoffs. The ALJ, in turn, denied back pay on the basis of a somewhat obscure theory apparently related to the union's failure to request bargaining over the continuation or termination of the layoffs. *Id.* at 387. The ALJ did find that the company never knew of the need for layoffs very far in advance, but his only treatment of the evidence that these layoffs would have been made in any event was to reject it as a defense to the refusal-to-bargain charge. *Id.* at 386. Since it was not a valid defense to that charge,[9] he did not find whether it had been proved.

The company, however, introduced considerable evidence that its economic condition would have required the layoffs even if there had been bargaining. Its controller testified at some length about the depressed state of its business at the time of the layoffs, and introduced charts showing the decline in backlog during the relevant periods. We remand the case to the Board to determine whether and by how much bargaining would have delayed the layoffs.[10]

---

**9.** *See Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 214, 85 S.Ct. 398, 404–405, 13 L.Ed.2d 233 (1964); *NLRB v. W.R. Grace & Co.,* 571 F.2d 279, 283 (5th Cir.1978).

**10.** We deem it appropriate to discuss one further issue, although no party has raised it here. In some cases, the Board has argued that any proof that certain employees would not have had jobs for reasons other than unfair labor practices should be left for compliance proceedings. This argument has had some success. *See NLRB v. J.S. Alberici Construction Co.,* 591 F.2d 463 (8th Cir.1979) (finding of discriminatory refusal to hire; court stated that question whether the company would have hired discriminatee on subsequent jobs is one for compliance proceeding); *Great Chinese American Sewing Co. v. NLRB,* 578 F.2d 251 (9th Cir.1978) (company shut down and all workers fired because of union activity; question whether employees would have been fired

later for nondiscriminatory reasons is for compliance proceedings). It should be noted, however, that both of these cases appear to have involved allegations which would have reduced rather than eliminated the back pay award, and that *Alberici* left for compliance proceedings virtually the identical question that the Fifth Circuit addressed in enforcement proceedings in *Haberman.* The Ninth Circuit, in *Fort Vancouver Plywood Co., supra,* rejected the argument that the company's contention that it would eventually have fired its non-shareholder workers even in the absence of unfair labor practices should be left for compliance proceedings. The court noted that the Board had ordered reinstatement for all workers, and that the order evidently contemplated no further proceedings to determine who was eligible for reinstatement. 604 F.2d at 603. The defense to the back pay award was relegated to the compliance proceedings, however, because the back pay order was "indefinite." *Id.*

### V. CONCLUSION.

We find no merit in any of the company's challenges to the Board's unfair labor practice rulings. The finding of a violation of Scott's *Weingarten* right is supported by substantial evidence. Of the objections to the refusal-to-bargain findings, the *First National Maintenance* issue was not properly presented to the Board, and the default is not excused by "extraordinary circumstances;" the impasse and waiver arguments are unsupported by the evidence. We therefore enforce the portions of the Board's order that found that the company had committed unfair labor practices by denying Scott's request for union representation and by laying off workers in March and April, 1980, without notification to or bargaining with the union. We also enforce the cease-and-desist order the Board issued as a remedy for the *Weingarten* violation.

We deny enforcement, however, to the Board's order of back pay as a remedy for the refusals to bargain. We remand the case to the Board for a finding on whether bargaining would have resulted in any change in the number or timing of the layoffs, or whether the company's economic situation would have required the layoffs in any event.

ENFORCEMENT GRANTED IN PART; ENFORCEMENT DENIED AND CASE REMANDED IN PART.

---

In *Fort Vancouver Plywood Co.,* as in *Great Chinese American Sewing Co.,* it was clear that some back pay was owed. By contrast, if the company proves its contention that the layoffs would have occurred when and as they did even if there had been bargaining, no back pay would be owed in this case. The Board's order requires that the company pay all of the laid-off employees "their normal wages" for the over three-year minimum period. The situation thus resembles that of the reinstatement order in *Fort Vancouver Plywood Co.,* and therefore we, like the Ninth Circuit, should not defer the issue to compliance proceedings.