**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-60976

RAVEN SERVICES CORPORATION,
d/b/a RAVEN GOVERNMENT SERVICES, INC.

Petitioner-Cross-Respondent,

VERSUS

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

Petition for Review and Cross Application for Enforcement of an
Order of the National Labor Relations Board

December 18, 2002

Before DAVIS, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This case involves a petition for review of a National Labor Relations Board (NLRB) order by Raven Services Corporation (Raven) and a cross-application by the NLRB for enforcement of its order. The NLRB found Raven had committed unfair labor practices by: (a) refusing to bargain with the International Union of Operating

1

Engineers, Local 351, AFL-CIO (Union)[1] and refusing to provide the Union with requested information in violation of National Labor Relations Act (NLRA) § 8(a)(1) and (5) (29 U.S.C. § 158(a)(1) and (5)); (b) unilaterally eliminating job classifications, changing wage rates, and directly dealing with employees regarding these changes in violation of NLRA § 8(a)(1) and (5); (c) withdrawing recognition of the Union as exclusive collective bargaining agent for the employees in violation of NLRA § 8(a)(1) and (5); and (d) interrogating employees regarding Union activities without advising them of their rights not to answer such questions, also in violation of § 8(a)(1).

In its petition for review Raven only challenges the NLRB's finding that its unilateral elimination of job classifications and reclassification of certain employees violated the NLRA. It argues that this claim was improperly amended to the complaint after the end of the trial, and therefore was not properly before the NLRB. It also argues that even if the charge was properly in front of the NLRB, it erred in its finding of an unfair labor practice, either because Raven was entitled to make the unilateral changes under a management rights clause imposed at an earlier impasse in negotiations, or because it had a good faith belief that the Union no longer represented the majority of workers, and hence did not

---

[1] International Union of Operating Engineers, Local 826, AFL-CIO and Local 351, AFL-CIO merged effective March 1, 1997 to form Local 351.

need to bargain with it. Raven finally argues that even if it violated the NLRA, the NLRB's imposition of backpay for those workers affected by the unilateral change was either inappropriate or improperly calculated. The NLRB cross-petitions for enforcement of its entire order.

For the reasons below we grant the NLRB's requested enforcement order in full.

## I. Factual and Procedural Background

Raven is a Virginia corporation with an office in Fort Worth, Texas, where it is engaged in the business of providing maintenance services for the United States Bureau of Engraving and Printing. On December 24, 1992, the NLRB certified the Union as the exclusive collective-bargaining representative of Raven's service and maintenance employees at the Fort Worth facility.

In 1993, the parties met in ten bargaining sessions in an unsuccessful effort to negotiate a collective bargaining agreement. Another attempt at collective bargaining in August 1994 also failed. Following these failed negotiations, Raven declared bargaining at an impasse, and unilaterally imposed the proposals it had made in negotiations. These proposals included a management rights clause that allowed the company to unilaterally layoff, reclassify, demote or transfer its employees. An NLRB Administrative Law Judge (ALJ) confirmed that bargaining was at an impasse in a November 24, 1994 opinion, and held that Raven was

3

correct in implementing its pre-impasse proposals, including the management rights clause.

In August 1996 the Union elected a new group chairman, Kenneth Forge. Around that time several external events led the Union to consider re-opening negotiations. First, Union members were aware that the contract between Raven and the U.S. Bureau of Engraving and Printing was to expire in September 1996, and rumors abounded that under the renegotiated contract there would be classification changes and wage cuts. Second, unit employees had not received a pay increase in 3 years, and were hoping to achieve such an increase in negotiations. Third, given that there had been no negotiations since the August 1994 meetings, nearly 2 years earlier, and no substantive progress on negotiations since the 1993 negotiations, the Union hoped a passage of time would result in changed bargaining positions.

On September 20, 1996 the Union business representative and president Barney Allen sent a letter to Raven requesting a date for new negotiations, as well as information to aid the Union in those negotiations. In two letters, dated September 30, 1996 and October 14, 1996 Raven's attorney, Buddy David, refused to provide the information requested in the September 20 letter or to set a date for negotiations, referencing the earlier negotiating impasse. Further, notwithstanding the September 20th letter, on October 1, 1996, Raven eliminated two classifications without any notice to or consultation with the Union, laying off two employees and

4

reclassifying two employees within a lower wage category. In another letter to the company dated October 22, 1996, Allen noted the Union's intent to develop new bargaining proposals, and reiterated its demand for information to help it do so. In further correspondence, the Union requested information and negotiations, but Raven denied all requests.

On August 29, 1997 the Union filed an unfair labor practices complaint against Raven with the NLRB. The case was tried in September 1997 before an ALJ. At the close of argument, but before findings were issued, the NLRB General Counsel amended the complaint to add the charge alleging that Raven violated the NLRA by making the October 1, 1996 changes. On December 11, 1997 the ALJ issued his opinion finding Raven had committed several violations of the NLRA, including a finding that the October 1 changes were illegal. Raven appealed the decision to the NLRB, and on June 30, 2000 the NLRB affirmed the ALJ's opinion in all relevant parts, except that it changed the method of backpay computation for employees affected by the unilateral changes from the F.W. Woolworth, 90 N.L.R.B. 289 (1950), method prescribed by the ALJ, to the Ogle Protection Service, 183 N.L.R.B. 682 (1970), method.[2] On May 2, 2001 the NLRB General Counsel filed a motion to "clarify" or "modify" the earlier judgment to return the backpay

---

[2]The Ogle backpay computation method allows the employer credit for all interim earnings, while the F.W. Woolworth method excludes interim earnings in each calendar quarter to the extent the interim earnings exceed the backpay obligations for that quarter.

computation method to the <u>Woolworth</u> method.  This motion was granted on November 6, 2001, and Raven appealed the entire modified order to this court.

## **II.  Unilateral Classification Eliminations**

*A.  Amendment of the Complaint*

Raven first argues that the issue of whether the unilateral classification changes violated the NLRA was not properly before the NLRB, because the charge was not added to the complaint until after the close of arguments.  Raven claims the ALJ erred in allowing this amendment, and that therefore this court should dismiss that charge.  Alternatively, petitioner argues that the record should be reopened now to allow it to develop evidence in its defense, and that therefore we should remand the case to the NLRB.

We are not persuaded by Raven's arguments.  Section 10(b) of the NLRA provides that an NLRB complaint "may be amended by the . . . Board in its discretion at any time prior to the issuance of an order based thereon."  29 U.S.C. § 160(b).  We have previously held that "a complaint before the Board is not judged by rigid pleading rules.  A finding not based on a charge in the complaint will be enforced if the issue was fully and fairly litigated at the hearing."  <u>Huck Mfg. Co. v. NLRB</u>, 693 F.2d 1176, 1187 (5th Cir.

1982).[3]  The ALJ found the issue of the unilateral classifications was fully and fairly litigated at trial, and that therefore a finding on the issue of the unilateral classifications was appropriate.

This ALJ determination, adopted by the NLRB, is supported by substantial evidence.[4]  The original complaint charged Raven with directly discussing the October 1 changes with employees in lieu of bargaining with the Union.  This charge should have put Raven on notice that the NLRB considered petitioner's failure to bargain with the Union over those changes unlawful.  Moreover, it was a Raven witness, its senior vice president Robert C. Pittman, who provided the NLRB with the facts it used to formulate the complaint related to the October 1 changes.  And once the charge was added to the complaint, Raven did not ask to be allowed to present witnesses on the new charge,[5] nor did it offer any objection when

---

[3]Raven incorrectly contends that NLRB v. Kanmak Mills, 200 F.2d 542 (3rd Cir. 1952), provides the standard for determining when an amendment to an NLRB complaint should be allowed.  This Third Circuit case is not controlling and in conflict with our circuit precedent.

[4]We review NLRB mixed law-fact determinations under the substantial evidence standard.  NLRB v. United Ins. Co. of America, 390 U.S. 254, 260 (1968).  Evidence to support a determination must be more than a mere scintilla; rather, it must be such evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

[5]The first request by Raven to be allowed to introduce more evidence related to this charge came in a brief after the ALJ closed the record with no objection from Raven.

the ALJ asked it whether he could close the record.[6]  Under such circumstances Raven's argument that the issue was not fully or fairly litigated lacks substantiation and does not prevent a reasonable contrary conclusion.

Likewise, Raven's argument that we should remand this case to the NLRB to allow for additional fact finding on this issue is unpersuasive.  Petitioner states that if it is allowed to introduce new evidence, it would show that the government strongly influenced its choice to eliminate job classifications in its contract negotiations with Raven in September 1996.  The NLRB's Rules and Regulations provide that such a motion must "state briefly the additional evidence to be adduced, why it was not presented previously, and that if addressed and credited, it would require a different result."  29 C.F.R. § 102.48(d)(1) (2002).  The ALJ's found that Raven did not comply with this standard.

This finding is supported by substantial evidence on the record.  To begin with the motion failed to explain why the evidence was not introduced before the record was closed.  As noted above, Raven had the opportunity to introduce evidence into the

---

[6]The ALJ's report details the efforts of the ALJ to ensure that Raven had adequate opportunity to introduce evidence related to October 1 changes.  After the amendment to the complaint the ALJ decided to forego a planned bench ruling on the case in the interest of giving Raven time to "fully brief" the new charges. But at no time between the amendment and the closing of the record did Raven seek to present evidence on the new charge.  Further, before closing the record the ALJ asked Raven whether there was anything further before the record was closed.  Raven's counsel responded, "Nothing from us."

record relating to the October 1 changes after the complaint was amended to add the new charge but before the record was closed. Raven failed to do so, and the motion provided no reasons for this failure. Further, the motion failed to explain why the evidence Raven sought to introduce would be outcome determinative. Raven's motion did not give an adequate explanation why evidence that a government contract mandated the classification elimination would have relieved Raven of its obligation to discuss the changes with the Union. Accordingly, the ALJ did not err in refusing to reopen the record, and we will not disturb that decision here.

*B. Impasse*

Raven next argues that even if its unilateral elimination of job classifications was properly in front of the NLRB, those cuts did not violate the NLRA. Rather, petitioner claims it acted legally pursuant to a management rights clause implemented during the impasse in negotiations reached in 1994.

There is no dispute in this case that Raven and the Union were at impasse in 1994, and that Raven was at that time justified in implementing its pre-impasse proposals. See Gulf States Mfg v. NLRB, 704 F.2d 1390, 1398n.4 (5th Cir. 1983) (explaining that employers may unilaterally implement negotiating proposals at impasse). It is also not disputed here that these proposals included a management rights clause that would allow for the unilateral changes complained of here. We have previously held

9

that such clauses may be implemented at impasse.  <u>NLRB v. Intracoastal Terminal, Inc.</u>, 286 F.2d 954, 958 (5th Cir. 1961).[7]

The issue, instead, is whether the parties were still at impasse on October 1, 1996, and therefore whether Raven could still act pursuant to the management rights clause and forego its NLRA obligation to bargain with the Union over the changes.[8]  Impasses cannot continue forever, as they are by definition temporary.  <u>See</u> <u>Charles D. Bonnano Linen Serv., Inc. v. NLRB</u>, 454 U.S. 404, 412

---

[7] At oral argument the attorney for the NLRB suggested that we should reconsider this rule, and defer to the NLRB's determination that management rights clauses cannot be implemented at impasse. This argument was not briefed, however, and is not properly before us.  <u>L & A Contracting Co. v. Southern Concrete Servs.</u>, 17 F.3d 106, 113 (5th Cir. 1994).

[8] The ALJ concluded that the changes could not be made pursuant to the management rights clause because there was no "clear and express waiver" by the Union of its right to bargain on these changes.  The NLRB argues that we should uphold this conclusion. Where the NLRB applies an incorrect legal standard, however, we cannot enforce its order.  <u>Ford Motor Co. v. NLRB</u>, 441 U.S. 488, 496-97 (1979).  Here, the ALJ made such a mistake, as he confused waiver doctrine with impasse doctrine.

The waiver doctrine allows a union to explicitly forego its NLRA bargaining rights in a collective bargaining agreement.  Where an employer claims it is acting unilaterally pursuant to such an agreement, the correct inquiry is whether the union in fact waived its right of negotiation.  <u>NLRB v. McClatchy Newspapers, Inc.</u>, 964 F.2d 1153, 1157 (D.C. Cir. 1992) (Edwards, J., concurring). Where, as here, the terms were imposed because there is no agreement, however, there is by definition no waiver.  And requiring a waiver would defeat the purpose of the impasse theory, which is to temporarily suspend the duty of an employer and union to bargain over a subject where negotiations prove fruitless.  <u>Id.</u> at 1158, 1164.  Thus, to the extent that the ALJ and NLRB required Raven to obtain a waiver from the Union before acting under the management rights clause implemented at impasse, such a requirement has no reasonable basis in law.

(1982) (defining impasse as a "temporary deadlock or hiatus in negotiations").  "Anything that creates a new possibility of fruitful discussion (even if it does not create a likelihood of agreement) breaks an impasse: a strike may . . . so may bargaining concessions, implied or explicit . . . the mere passage of time may also be relevant."  Gulf States Mfg., 704 F.2d at 1399.

Because the ALJ erroneously based his determination that the October 1 changes were illegal on the waiver theory, he never had to rule on whether the 1994 impasse was still in existence on October 1, 1996.[9]  The factual findings of the ALJ, however, clearly reflect that the impasse was broken prior to the October 1 changes.  Two reasons counsel this ruling.  First, "it is well settled that a failure to supply information relevant and necessary for bargaining constitutes a failure to bargain in good faith and precludes a finding of a genuine impasse."  New Associates d/b/a Hospitality Care Ctr., 307 N.L.R.B. 1131, 1135-36 (1992).  See also Olivetti Office U.S.A. Inc. v. NLRB, 926 F.2d 181, 188-89 (2nd Cir. 1991) (noting that bargaining in good faith requirement of impasse

---

[9]Raven argues that the ALJ in fact held that the impasse was broken on October 22, 1996 by a Union letter indicating it was interested in formulating new proposals to break deadlock.  While the ALJ certainly states that there was no impasse after October 22, he does not rule that there was a valid impasse prior to that date.  The ALJ writes that his focus on the October 22 letter is "assuming there was a valid impasse" on October 22.  Under the ALJ's erroneous application of the waiver theory it was irrelevant whether the impasse broke prior to October 22, and thus we do not read the ALJ's opinion as having make a determination on that issue.

cannot be met where employer refuses to furnish information on union request).  Here, the Union's September 20 letter requested information from Raven regarding currently available employee benefit plans, job classifications, pay rates, and work schedules. This information was "relevant and necessary" for bargaining purposes.  When Raven refused to provide that information in its September 30 letter, it could no longer be said that a genuine impasse still existed, as Raven was artificially perpetuating deadlock.  Thus, by at least September 30 the impasse had ceased to exist.[10]

Second, application of the Gulf States test for determining when impasse is broken makes clear that there was no impasse in negotiations at the time of the October 1 changes, as several factors suggested the possibility of "fruitful negotiations."  As noted above, the Union had elected a new unit head in August 1996. Such a change in key Union personnel suggests the possibility of a changed Union approach to the negotiations.  Airflow Research & Mfg. Corp., 320 N.L.R.B. 861, 862 (1996).  Further, by Raven's own

_____

[10]The ALJ had concluded that on or about October 14 Raven violated the NLRA by refusing to provide the Union with information it requested for formulating bargaining proposals. Upon review of the record, however, it is clear that Raven sent the Union two substantially identical letters in response to the Union's September 20 letter.  These letters, sent on September 30 and October 14, refused to provide the Union with the requested information as a consequence of the earlier impasse.  Thus, to the extent that the ALJ's finding was that October 14 was earliest date of Raven's failure to provide information offense, that determination is not supported by substantial evidence on the record.

admission the coming change in government contracts at the end of September 1996 created changed economic circumstances in terms of Raven's contract cost obligations. These changed economic circumstances altered the backdrop against which negotiations would be conducted, and offered the possibility of productive bargaining. Finally, as we noted in Gulf States Manufacturing, the mere passage of time can suggest that new negotiations should be had. Gulf States Mfg., 704 F.2d at 1399. Raven had declared an impasse more than two years before the October 1, 1996 changes,[11] and given this time, along with the other foregoing factors, we conclude that an impasse no longer existed on October 1, 1996.

Because the bargaining impasse between Raven and the Union had ceased or been broken before October 1, Raven could not have validly made the classification eliminations pursuant to the prior unilaterally implemented management rights clause. The duty to bargain resumes on the break or cessation of impasse. See Charles D. Bonnano Linen Serv., 454 U.S. at 412 (upholding Hi-Way Billboards, Inc., 206 N.L.R.B. 22, 23 (1973), rule holding that impasse temporarily suspends, not permanently breaks, the duty to bargain). Accordingly, the NLRA's bargaining requirement was applicable, and Raven's failure to bargain was a violation of that act.

---

[11]Raven declared an impasse after a failed bargaining meeting in August 1994, and an NLRB ALJ confirmed that bargaining was at an impasse in a November 1994 opinion.

*C.    Union Majority Status*

Raven argues in the alternative that its unilateral elimination of job classifications was proper because it acted in the good faith belief that the Union no longer enjoyed the support of the majority of its members.  When an employer has such a good faith belief it may withdraw recognition from a union and refuse to bargain with it.  Allentown Mack Sales & Servs., Inc. v. NLRB, 522 U.S. 359, 359 (1998).  To determine whether an employer in fact holds such a belief, we apply a two part test in which the employer bears the burden of proof.  NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787 (1990).  First, we ask whether at the time of its refusal to recognize a union, the employer had a "reasonable uncertainty" about whether the union enjoyed the continuing support of its members.  Allentown Mack, 522 U.S. at 367, 371.  These doubts must be supported by objective evidence external to the employer's subjective impressions.  Id. at 368n.2.  Second, we consider whether the employer's uncertainty is held in good faith (i.e., is it "genuine"?).  Id. at 371.  To be held in good faith the doubt must arise in a context free of unfair employer labor practices that could have reasonably tended to contribute to employee dissatisfaction with its union.  United Supermarkets, Inc. v. NLRB, 862 F.2d 549, 554n.6 (5th Cir. 1989).

The ALJ concluded that Raven had not met the first prong of this test, concluding it had failed to point to sufficient evidence

14

on which it could have based a good faith doubt of the Union's majority status on October 1, 1996.  The ALJ also held that the Raven had failed to demonstrate that its doubts were held in good faith, as they were reached in the context of wide ranging unfair labor practices that undermined Union support among employees.  We review these determinations under the substantial evidence standard.  <u>Allentown Mack</u>, 522 U.S. at 366.  Put another way, we must consider whether a reasonable fact-finder could have found that Raven lacked a "genuine, reasonable uncertainty" about the Union's majority status.  <u>Id.</u> at 367.  We conclude that a reasonable fact-finder could make such a determination.

First, we agree with the ALJ that Raven has failed to point to sufficient evidence on which it could have based a good faith belief that the Union lacked majority status in October 1996.  In its brief Raven cites five pieces of evidence that it relied upon to question the Union's majority.  It noted: (1) lack of real efforts by the Union to obtain an agreement; (2) the Union's inability or refusal to formulate proposals to break the impasse; (3) Union inactivity from January to September 1996, including the failure of the Union to provide Raven with a list of stewards; (4) substantial workforce turnover from the certification of the Union in December 1992 to October 1996; and (5) a rumor that a decertification petition was circulated by an employee in January or February 1996.

Raven's actions were principally the reason for the Union's

15

inability to formulate proposals that resulted in an agreement. By refusing to give the Union the materials it requested in its September 20 letter, Raven denied the Union the information it needed to formulate new proposals. As for the remaining evidence, after considering it as a whole we believe that a reasonable fact finder could conclude that Raven did not have "reasonable uncertainty" as to the Union's status. Contrary to Raven's claims, there was at least some activity by the Union of which petitioner was aware in 1996, including the election of Kenneth Forge as Union steward. The workforce turnover that Raven notes was insufficient to establish good faith doubt of majority status, unless there was some reason to believe that the new workers were less likely to support the Union. NLRB v. A.W. Thompson, Inc., 525 F.2d 870, 871-72 (5th Cir. 1976). Raven offers no evidence to support such a conclusion. And Raven's information concerning the decertification petition was a scant rumor at best. Raven made no attempt to substantiate the hearsay information until September 1997, nearly a year after the October 1, 1996 unilateral changes. Unsubstantiated rumors of a decertification petition, even combined with workforce turnover and limited activity by the Union over a 9 month span, do not constitute sufficient grounds for reasonable uncertainty over the Union's majority status. Cf. Allied Indus. Workers v. NLRB, 476 F.2d 868, 881-82 (D.C. Cir. 1973) (noting that "naked information" regarding the filing of a decertification petition without information regarding the number of signatories is

16

insufficient to create good faith doubt of union majority status, even with additional evidence present).

Even assuming arguendo that Raven had reasonable uncertainty about the Union's majority status, we agree with the NLRB's conclusion that this belief was not held in good faith. Raven did not inform the Union that it doubted its majority status until July 1997, nine months after it made the October 1, 1996 changes unilaterally. Given this time lag, Raven's claim that it genuinely doubted the Union's majority status in October 1996 appears more as a post hoc rationalization for unilateral action, than a real reflection of its beliefs. Moreover, the doubts Raven claimed to have had on October 1, 1996 were rendered suspect by its refusal of the Union's September 20, 1996 request for information necessary or useful to the formulation of bargaining proposals. Raven's unlawful refusal of information itself threatened to undermine support for the Union among workers by rendering futile the Union's attempts to formulate a new bargaining proposal. It is exactly this kind of coercive anti-union employer practice that we have previously held prevents an employer from establishing good faith doubt as to a union's majority status. United Supermarkets, 862 F.2d at 553n.6.

Thus, the NLRB's determination that Raven lacked good faith doubt as to the Union's majority status entitling it to act unilaterally in making the October changes is supported by substantial evidence on the record. We therefore conclude the NLRB

did not err in finding that Raven's unilateral October 1, 1996 changes constituted an unfair labor practice.

*D.   Backpay Remedy*

In its final ground of error Raven argues that even if it acted improperly in its October 1 changes, the NLRB erred in ordering backpay for the affected workers, or at the least in using the F.W. Woolworth, 90 N.L.R.B. 289 (1950), method of backpay calculation rather than the Ogle Protection Services, 183 N.L.R.B. 682 (1970), method.  We find neither argument persuasive.

Raven claims the October 1 layoffs could not have been avoided through bargaining with the Union because the government required the company to take the actions in question in order to cut labor costs to meet the demands of a new contract. "[A] back pay or restitution order will not be enforced where the result of the enforcement would be to put the worker in better position than he would have been without the violation." Gulf States Mfg., 704 F.2d at 1400-01.  This rule applies where a company proves, "layoffs would have occurred when and as they did even if there had been bargaining."  Id.

Unfortunately for Raven it never made this argument to the ALJ or the NLRB.  Therefore, this court lacks jurisdiction, absent extraordinary circumstances, to consider this argument on appeal. Detroit Edison Co. v. NLRB, 440 U.S. 301, 311n.10 (1979) ("[NLRA] Section 10(e) precludes a reviewing court from considering an

18

objection that was not urged before the Board."). Raven argues that because it lacked notice of the classification issue before the close of evidence, it lacked the opportunity to make this argument to the ALJ. As we noted above, however, not only was Raven on notice that the NLRB found the October 1 changes problematic, but it was given adequate opportunity to respond to the charge before the close of evidence. Under such circumstances, no extraordinary explanation for failure to exhaust this argument exists.

Raven next argues that the NLRB erred when it granted the General Counsel's Motion to Reconsider its holding as to the appropriate back pay computation method to be used in this case. Raven urges this court to find that the motion, filed as a § 102.49 Motion for Clarification or Modification, was actually a Motion for Reconsideration and thus was not timely filed under Section 102.48(d) of the Board's Rules and Regulations.[12]

Section 102.48(d)(2) of the Board's Rules and Regulations provides that a party's request for reconsideration, rehearing, or reopening of the record must generally be filed within 28 days of the Board's decision. Section 102.49 states:

---

[12]As explained above the ALJ originally recommended backpay be computed according to the F.W. Woolworth method of backpay calculation. The NLRB's original order, filed on June 30, 2000 changed the method of calculation to the method set out in Ogle Protection Service. The NLRB General Counsel then filed a motion to clarify or modify its earlier order on May 2, 2001 to return the backpay computation to the F.W. Woolworth method, which the NLRB granted.

19

> Within the limitations of the provisions of section 10(c) of the Act, and §§ 102.48, until a transcript of the record in a case shall have been filed in a court, within the meaning of section 10 of the Act, **the Board may at any time upon reasonable notice modify or set aside, in whole or in part, any findings of fact, conclusions of law, or order made or issued by it.** Thereafter, the Board may proceed pursuant to §§ 102.50, insofar as applicable.

29 C.F.R. § 102.49 (2002) (emphasis added). Raven argues that because § 102.49 makes no provisions for motions, the General Counsel's motion here must have been made pursuant to § 102.48(d). Cf. NLRB v. Selvin, 527 F.2d 1273, 1276 (9th Cir. 1975) (holding that motions made by parties to reopen record must be made within the parameters of § 102.48(d), rather than § 102.49). Because the motion here was filed 11 months after the original opinion, Raven reasons that it was untimely under § 102.48(d)(2) and should not have been considered.

In rejecting this argument the NLRB cited Dorsey Trailers, 322 N.L.R.B. 181 (1996), in which it denied an identical argument. There the NLRB reasoned that if it had the power under § 102.49 to modify its order sua sponte any time before the matter was filed with the circuit court, it could not lose that power simply because the General Counsel filed a motion for the change that he was not mandated to file. Cases like Selvin were inapposite, the NLRB concluded, because they dealt with a party's attempt to get an aspect of a decision reconsidered, rather than the General Counsel.

We need not address the merits of Dorsey Trailers because, assuming arguendo that the General Counsel's motion was a §

20

102.48(d) motion, it was within the NLRB's discretion to accept that motion beyond the 28 day deadline. In NLRB v. U.S.A. Polymer Corp., 272 F.3d 289, 296 (5th Cir. 2001), we explained that the NLRB can, at its discretion, disregard the 28 day deadline of § 102.48(d)(2), and consider motions filed after the deadline. Thus, even if the motion here was filed pursuant to § 102.48(d), the NLRB was acting within its authority to consider the motion. Raven's point of error has no merit.

### III. Enforcement Order

The NLRB cross-petitions for enforcement of its order pursuant to 29 U.S.C. § 160(e). An order issued by the NLRB does not have the effect of law, and the NLRB has no authority to compel compliance or punish noncompliance. The NLRB is thus generally entitled to an enforcement order to bar the continuation or resumption of unfair labor practices. NLRB v. Mexia Textile Mills, Inc., 339 U.S. 563, 567-68 (1950).

Except for the objections discussed and denied above, Raven does not contest the NLRB's findings. Rather, it argues that enforcement is not warranted because the uncontested charges are all moot. The U.S. Supreme Court has recognized that an enforcement may become moot if a party can show "there is no reasonable expectation that the wrong will be repeated." NLRB v. Raytheon Co., 398 U.S. 25, 27 (1970) (citing NLRB v. Jones & Laughlin Steele Corp., 331 U.S. 416, 428 (1947), and United States

21

v. W.T. Grant Co., 345 U.S. 629, 633 (1953)). Here, Raven makes two arguments why an enforcement order is moot.

First, it argues that the order is moot pursuant to our decision in Cagle's, Inc. v. NLRB,588 F.2d 943 (5th Cir. 1979). In Cagle's this court held that an agreement between an employer and union can be the basis of a conclusion that there is no "reasonable expectation the wrong will be repeated." Cagle's, 588 F.2d at 951. Raven argues that an agreement between it and the Union made after the NLRB's order render all but the direct dealing with employee charge moot, as the agreement ensures there is no reasonable expectation that the other transgressions will be repeated. There is no evidence of such an agreement in the record, however. As Raven as petitioner bears the burden of introducing evidence that shows an enforcement order request is moot, NLRB v. CJC Holdings, Inc., 97 F.3d 114, 116 (5th Cir. 1996), the absence of evidence of the agreement in the record means its Cagle's argument fails.

Second, Raven argues that it is in substantial compliance with the orders, and that the fact that no new complaints have been filed since 1996, shows it will not violate orders in the future. However, "compliance with an order of the Board does not render the cause moot, depriving the Board of its opportunity to secure enforcement from an appropriate court." Mexia Textile Mills Inc., 399 U.S. at 567. Accordingly, Raven's compliance cannot prevent us from granting the NLRB's requested order, and we conclude such an order is warranted.

**IV. Conclusion**

Because we find petitioner Raven Services' grounds for review lack merit, its petition for review is DENIED. Cross-petitioner NLRB's motion for an enforcement order is GRANTED in full.

PETITION FOR REVIEW DENIED; ENFORCEMENT ORDER GRANTED.