United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 23, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-30940

MICHAEL HENRY,

Plaintiff - Appellant,

VERSUS

CISCO SYSTEMS, INC.; CISCO SYSTEMS CAPITAL CORPORATION

Defendants - Appellees

Appeal from the United States District Court
For the Eastern District of Louisiana

(00-CV-3519)

Before EMILIO M. GARZA and DENNIS, Circuit Judges, and HEAD[*],

District Judge.

DENNIS, Circuit Judge:[**]

Plaintiff-appellant Michael Henry appeals the district court's

rulings regarding his fraudulent inducement claim and his four

defamation claims against defendants-appellees Cisco Systems, Inc.

---

[*] District Judge of the Southern District of Texas, sitting by
designation.

[**]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

and Cisco Systems Capital Corporation ("Cisco"). The court granted summary judgment on Henry's fraudulent inducement claim on prescriptive grounds. As for the defamation claims, the district court dismissed one claim[1] and granted summary judgment in favor of Cisco on the others because Cisco's alleged defamatory statements were protected by an absolute litigation privilege. We affirm.

## I. Background

Henry, a Louisiana citizen, is a successful businessmen in the telecommunications industry. He built Megasnet, an Internet Service Provider, which he sold in 1999 for $100 million. Cisco provides hardware and software products and services used to support, among other things, telecommunications equipment. Cisco was in a strategic alliance with American MetroComm Corporation ("AMC"), to whom it had sold $20 million of VCO/4K equipment, a programmable phone switch intended to allow unlimited long distance phone calls over the Internet.

In June 1999, shortly after Henry sold Megasnet, Cisco recruited Henry to become CEO of AMC because AMC was experiencing delays in deployment of its network and needed Henry's expertise. After negotiations, Henry accepted the CEO position on July 1, 1999 and agreed to invest $2 million in AMC. While Henry was CEO of AMC, he encountered a number of difficulties with the VCO/4K

---

[1] Cisco did not file a motion to dismiss the remaining defamation claims based on an absolute litigation privilege.

equipment, which could not be properly installed because it was not NEBS compliant,[2] and AMC's financial solvency. Despite attempts to fix the equipment and become more financially stable, AMC was unable to do so.

On August 16, 2000, AMC filed a bankruptcy petition in the United States Bankruptcy Court for the District of Delaware. Among AMC's creditors was Cisco. In connection with the bankruptcy proceeding, Cisco filed a motion to appoint a trustee to conduct and oversee the affairs of AMC's bankruptcy along with a memorandum in support. In the memorandum, Cisco called into question Henry's ability to successfully and effectively protect the interests of AMC, its creditors, and its equity holders during the bankruptcy, given his "volatile and contentious nature." Allegedly, a copy of this pleading was given to a Dow Jones reporter, Jeffrey St. Onge, who published an article in The Daily Bankruptcy Review on the AMC bankruptcy.

On October 5, 2000, in Dallas, Texas, counsel for Cisco, Kent Roger and Larry Engel, met with a number of AMC investors and their counsel to discuss AMC's bankruptcy. Roger and Engel allegedly distributed the bankruptcy memorandum discussed above and accused Henry of accepting "kickbacks."

---

[2] NEBS is an acronym for "Network Equipment Building Systems" and if equipment is certified as NEBS compliant then it can interface directly with other equipment that forms the world's telecommunications "backbone." Henry Original Brief, at 5 n.4.

3

In addition to the above, on May 20, 2000, Thomas Papson, a Washington, D.C. attorney acting as counsel for Cisco, participated in a phone conference with Chip Cooper, an Ohio attorney representing Kevin Bennett, a former Cisco employee. Bennett and Cisco were involved in litigation pending in federal court in Ohio and in an arbitration proceeding in California. The purpose of the call was to discuss settlement possibilities. According to Henry's Amended Complaint, Papson told Cooper that "Cisco believed Mr. Henry, Kevin Bennett, and Vince Rotundo were involved in a kickback scheme as part of the arrangement between [Worldwide Web Systems, Inc., the software provider for the VCO/4K] and AMC."

On November 29, 2000, Henry filed a diversity jurisdiction suit in the United States District Court for the Eastern District of Louisiana asserting state law claims against Cisco. Henry alleged that Cisco fraudulently induced him to accept the AMC CEO position and to invest $2 million in AMC by falsely telling him that the equipment Cisco sold AMC had been tested as NEBS compliant and worked properly and that AMC was financially solvent. He also alleged that he was defamed by statements made in the pleading Cisco filed in AMC's bankruptcy.

On February 12, 2001, Henry amended his complaint to add three additional defamation claims. These claims contend that Henry was defamed: (1) when a copy of the Cisco bankruptcy pleading was distributed to the Dow Jones reporter; (2) when Roger and Engel

4

accused Henry of accepting kickbacks in the Dallas meeting; and (3) when Papson told Cooper during a phone conversation that he believed Henry accepted kickbacks.

In response, Cisco filed a motion to dismiss. On September 19, 2001, the district court granted Cisco's motion and dismissed Henry's initial defamation claim concerning the statements in the bankruptcy pleading, finding that an absolute litigation privilege applied. Cisco also sought summary judgment as to Henry's remaining claims, which the district court granted. The district court held that the remaining defamation claims were also subject to an absolute litigation privilege and that the fraudulent inducement claim was barred by prescription. On August 28, 2002, the district court rendered a final judgment and Henry timely appealed.

## II. Analysis

### A. Standard of Review

We review both the grant of a motion to dismiss and the grant of summary judgment *de novo*, applying the same standards applicable to the district court.[3] In deciding a motion to dismiss, the district court must take the facts as alleged in the complaint as true, and may not dismiss the complaint unless it appears that the

_____

[3] *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004); *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

plaintiff can prove no set of facts in support of his claim that would entitle him to relief.[3] Summary judgment is properly granted if there is "no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law."[4]

**B.  Fraudulent Inducement Claim**

Henry argues that the district court erred in holding that his fraudulent inducement claim was barred by prescription.  He maintains that two exceptions to the general rules of prescription, *contra non valentum* and continuing tort, made his claim timely. Cisco disagrees, arguing that Henry was fully aware of his cause of action more than one year prior to filing to suit and that neither exception delayed the commencement of the prescriptive period for Henry's claim.

Because Henry's fraudulent inducement claim is a Louisiana state law claim, Louisiana law will determine the applicable statute of limitations period.[5]  Under Louisiana law, delictual actions, such as Henry's fraudulent inducement claim, have a prescriptive period that commence one year "from the date injury or

---

[3]  *Kennedy*, 369 F.3d at 839.

[4]  Fed. R. Civ. P. 56(c).

[5]  *U.S. ex rel. Mathews v. HealthSouth Corp.*, 332 F.3d 293, 295 (5th Cir. 2003).

6

damage is sustained."[6] Moreover, "[t]he defendant has the initial burden of proving that a tort claim has prescribed."[7] "[B]ut if the defendant shows that one year has passed between the tortious acts and the filing of the suit, then the burden shifts to the plaintiff to prove an exception to prescription."[8] *Id.*

Here, Henry alleges that he was fraudulently induced into accepting the AMC CEO position and investing $2 million in AMC. "Fraud exists if it can be shown that material misrepresentations have been made by one party designed to deceive another, and to obtain some unjust advantage or to cause loss or inconvenience to the other."[9] Thus, the general elements of a fraudulent inducement claim are: "(1) a misrepresentation of a material fact, (2) made with an intent to deceive, and (3) causing justifiable reliance with resulting injury."[10] Here, Henry claims that Cisco knowingly

---

[6] La. Civ. Code art. 3492; *Bell v. Demax Management Inc.*, 824 So.2d 490, 492 (La. Ct. App. 2002); Griffin v. BSFI Western E & P, Inc., 812 So.2d 726, 734 (La. Ct. App. 2002).

[7] *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 320 (5th Cir. 2002)(citing *Miley v. Consol. Gravity Drainage Dist*. No. 1, 642 So.2d 693, 696 (La. Ct. App. 1994); *Dixon v. Houck*, 466 So.2d 57, 59 (La. Ct. App. 1985)).

[8] *Id.*

[9] La. Civ. Code art. 1953; *Altex Ready-Mixed Concrete Corp. v. Employers Commercial Union Ins.*, 308 So.2d 889, 892 (La. Ct. App. 1975).

[10] *Kendall Co. v. Southern Med. Supplies, Inc.*, 913 F.Supp. 483, 487 (E.D. La. 1996); *Silver v. Nelson*, 610 F.Supp. 505, 517

7

made false assurances in June 1999 that the equipment Cisco sold AMC was NEBS compliant and worked properly and that AMC was financially solvent.  He further claims that these fraudulent misrepresentations induced him to accept the AMC CEO position and to invest $2 million in AMC.  Because he did not file suit until November 29, 2000, Cisco's alleged tortious acts occurred more than one year prior to Henry filing suit.  Therefore, Henry has the burden of proving an exception to prescription that would delay the commencement of the prescriptive period to after November 28, 1999.

**1.  *Contra Non Valentum***

Henry first contends that *contra non valentum* protects his fraudulent inducement claim.  This doctrine is "a limited exception where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues," for example if a defendant "has done some act to effectually prevent the [plaintiff] from availing himself of the cause of action" or if "the cause of action is not known or reasonably knowable by the plaintiff."[11]  Henry argues that he was unable to exercise his fraudulent inducement claim until at least January 2000 because Cisco attempted to conceal the fact that the VCO/4K equipment was not NEBS compliant and told him that it would fix the equipment problem and maintain

_____

(E.D. La. 1985).

[11] *Corsey v. State Dep't of Corrections*, 375 So.2d 1319, 1321-22 (La. 1979).

8

its alliance with AMC.

Cisco, however, has provided documents, affidavits, and deposition testimony to support its contention that Henry was fully aware, or at least reasonably should have been aware, prior to November 28, 1999, that the equipment was not NEBS compliant and that Cisco's representations to the contrary were false.[12] Further, Cisco maintains that Henry, as a sophisticated businessman who was CEO of the company of which he claimed to be ignorant, was aware of AMC's financial problems.[13]

---

[12] Cisco's proof that Henry knew before November 28, 1999 that the VCO/4K switch was not NEBS compliant, and that it was not forthcoming with Henry about it, includes: (1) a June 27, 2000 affidavit, in which Henry stated "[t]hat when he took over as AMC's CEO [in July 1999], the company ... was experiencing serious and continuous problems with crucial network equipment it had purchased from" Cisco; (2) a third party demand filed by Henry against Cisco in another lawsuit in which Henry admitted that "AMC had discovered during September [1999] that the Cisco equipment was not NEBBS compliant"; (3) a January 4, 2002 affidavit in which Henry stated that "[a]s of the first week of November 1999, AMC discovered that the equipment Cisco had delivered was not NEBBS compliant"; (4) an AMC Position Paper, prepared under Henry's supervision and authorship, which states that between August and September 1999, AMC learned that the VCO/4K switch was not NEBS compliant and that a Cisco employee had told Henry that Cisco had "lied" about the switch being compliant; and (5) a January 4, 2001 deposition in which Henry testified that he was told by a Cisco employee in October 1999 that the equipment was not NEBS compliant and that Cisco had been "less than truthful."

[13] Cisco's proof as to Henry's knowledge of AMC's financial circumstances prior to November 28, 1999, includes: (1) a June 26, 1999 AMC internal memo, which states that "Henry has been briefed on the Company's financial circumstances" and that Henry "stated that he does not want to become an officer of the Company unless [there is] at least $1Million in the bank, to address huge financial issues before us"; (2) a June 27, 2000 affidavit in which

Henry does not contest the veracity of Cisco's evidence proving that Henry should have known of his fraudulent inducement claim prior to November 28, 1999. Instead Henry contends that Cisco's attempts at concealment, such as failing to provide timely discovery after his suit was filed and Cisco's attempts to fix the equipment problems, delayed the commencement of the prescriptive period. Henry's failure to contest Cisco's evidence and Henry's argument itself reveal that he was aware of the facts necessary to establish his cause of action prior to November 28, 1999. Thus, his argument that Cisco still attempted to conceal information from and mislead him are irrelevant because those attempts were ineffectual. When considering the doctrine of *contra non valentum*, we focus on whether the plaintiff was able to bring his cause of action.[14] If, as here, the plaintiff knew of his cause of action and the defendant's attempts at concealment were ineffectual, the plaintiff was not prevented from bringing his claim; he just chose not to do so. "Contra non valentum does not suspend prescription when a litigant is perfectly able to bring its claim, but fails or refuses to do so."[15] Therefore, the district court properly

Henry states "[t]hat when he took over as AMC's CEO, the company was unable to service its debt"; and (3) a July 23, 1999 e-mail from Henry acknowledging that "[w]e are 4.7 million in the hole."

[14] *Corsey*, 375 So.2d at 1321-22.

[15] *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 885 (5th Cir. 2002). This is also applicable to Henry's other argument, that he was lulled into inaction because Cisco issued a

10

concluded that *contra non valentum* did not extend the commencement of the prescriptive period past November 28, 1999.

## 2. Continuing Tort

Henry next argues that because his claim alleges a continuing tort, his prescriptive period commenced late enough to make his claim timely. Under the continuing tort doctrine, "continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions."[16] Multiple acts will constitute a continuing tort "when the acts are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature."[17] If the plaintiff's claim involves a continuing tort, "then prescription does not commence until the last act occurs or the conduct is abated."[18]

Although Henry asserts that because Cisco's fraudulent conduct

---

press release on October 12, 1999 announcing a $60 million investment in AMC and because Cisco and AMC discussed fixing the NEBS problem. These actions did not affect Henry's ability to bring his claim; at most they just affected his desire to do so.

[16] *Wilson v. Hartzman*, 373 So.2d 204, 207 (La. Ct. App. 1979).

[17] *Bustamento v. Tucker*, 607 So.2d 532, 542 (La. 1992); *see also Crump v. Sabine River Authority*, 737 So.2d 720, 728 (La. 1999)("A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act.").

[18] *Bustamento*, 607 So.2d at 542.

did not abate until after November 28, 1999, the prescriptive period did not commence until that time, his argument is not persuasive. In his complaint, Henry contended only that Cisco's misrepresentations made prior to his accepting the CEO position and investing $2 million in AMC induced him to take these actions. Henry now contends that Cisco's supposed fraudulent actions that occurred after Henry became CEO and invested in AMC are actions that constitute part of the same continuing tort. But there is a clear delineation between Cisco's actions that took place prior to Henry acting and those that took place after, namely that the latter actions could not have induced Henry to take the actions he now regrets. They thus cannot form the basis for a claim of fraudulent inducement. Therefore, these two sets of activities are not of a "continuous, cumulative, synergistic nature" and thus cannot constitute a continuing tort.

Henry's argument that prescription should not begin to run until his damages ceased is also without merit. Even if Henry did suffer damages after November 28, 1999, this will not affect when prescription commences. "When a defendant's damage-causing act is completed, the existence of continuing damages to a plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort."[19] Instead,

---

[19] *In re Med. Panel Review for the Claim of Moses*, 788 So.2d 1173, 1183 (La. 2001).

12

prescription commences when the last tortious act occurs or the defendant's tortious conduct is abated.[20]  Because, as discussed above, the last tortious acts, i.e., those that induced Henry to act, committed by Cisco related to Henry's fraudulent inducement claim took place well before November 28, 1999, prescription began to run prior to that date.  Accordingly, the district court correctly held that Henry's fraudulent inducement claim was barred by prescription.

## B.  Defamation Claims

Henry claims that the district court erred in holding that his defamation claims were barred by an absolute privilege afforded to statements by parties and counsel made during the course of judicial proceedings.  Henry's four defamation claims were for: (1) the statements made in a motion to appoint trustee in AMC's Delaware bankruptcy; (2) the copy of that motion distributed to a Dow Jones reporter; (3) Cisco counsel's statements accusing Henry of accepting kickbacks in a meeting to discuss the AMC bankruptcy with investors; and (4) Cisco counsel's statements during settlement negotiations for an Ohio lawsuit and a California arbitration that he believed Henry accepted kickbacks.

Henry disagrees with the district court's decision to apply Delaware law to the first three claims and Ohio law to the fourth claim.  Delaware and Ohio law provide an absolute privilege against

---

[20]  *Bustamento*, 607 So.2d at 542.

13

defamation claims to parties and attorneys over otherwise defamatory statements made during the course of judicial proceedings that are relevant to the case.[21] "In Louisiana, however, the [litigation] privilege is a qualified one, and in order for the privilege to apply, the statement must be material and must be made with probable cause and without malice."[22]

A federal court sitting in diversity applies the law of the forum state, including its choice-of-law provisions.[23] Under Louisiana's choice-of-law provisions, delictual obligations such as fraud are generally controlled by Louisiana Civil Code Article 3542, which provides that issues involving delictual obligations are "governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."[24]

The district court concluded that the purpose of the absolute privilege is to "facilitate the flow of communication between persons involved in judicial proceedings and thus, to aid in the complete and full disclosure of facts necessary to a fair

---

[21] *Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992); *Willitzer v. McCloud*, 453 N.E.2d 693, 695 (Ohio 1983).

[22] *Freeman v. Cooper*, 414 So.2d 355, 359 (La. 1982)(quoting *Waldo v. Morrison*, 220 La. 1006, 58 So.2d 210 (La.1952)).

[23] *Klaxon Co. v. Stentor Electric Mfg.*, 313 U.S. 487, 496 (1941)(citing *Erie R.R. v. Tompkins*,304 U.S. 64 (1938)).

[24] La. Civ. Code art. 3542.

adjudication."[25]  After balancing this with Louisiana's policy of protecting its citizens from tortious conduct, the court held that "Delaware would be the state whose policies would be most seriously impaired if its laws were not applied."[26]  Thus, the court concluded that the first three claims, which all concerned statements made as part of the AMC bankruptcy proceeding in Delaware, were subject to Delaware law.  For the same reason, the court concluded that Ohio law applied to Henry's fourth defamation claim.

Henry contends that the district court erred and should have applied either Louisiana or federal common law regarding the litigation privilege.  But Henry's arguments are not persuasive. First, Henry makes no cognizable argument as to why Louisiana law should apply.  Instead he only makes the conclusory assertion that the district court was wrong in failing to apply Louisiana law. Because this issue was inadequately briefed, we consider it waived and will not reassess the district court's analysis of Louisiana's choice-of-law provisions.[27]

---

[25]  Sept. 20, 2001 District Court Order, at 13 (quoting *Barker*, 610 A.2d at 1341).

[26]  *Id.* at 14.

[27]  *Raven Servs. Corp. v. NLRB*, 315 F.3d 504 n.7 (5th Cir. 2002).  At most, Henry cites to Louisiana Civil Code Article 3543 when stating that "[u]nder the Louisiana choice of law provisions, the test is whether the defendants would have foreseen where the injury would occur."  Henry Original Brief, at 18.  Article 3543 is not applicable to our situation.  Article 3543 regulates choice of law analysis for tort issues relating to standards of conduct and safety.  *Id.*  However, issues of immunity, such as an absolute

15

Second, Henry contends that we should not apply an absolute privilege because it encourages retaliatory actions against whistleblowers in violation of federal common law principles and the Sarbanes-Oxley Act. Therefore, Henry, relying on the Seventh Circuit decision in *Steffes v. Stepan & Co.*,[28] urges the court to adopt a qualified privilege similar to that of Louisiana under federal common law.

But Henry's reliance on *Steffes* is misplaced. In *Steffes*, the Seventh Circuit declined to apply a state law absolute litigation privilege to a plaintiff's retaliation claims under Title VII and the Americans with Disabilities Act ("ADA"), instead affirming the district court's dismissal on other grounds.[29] In addition, the court also decided not to adopt a specific federal common law

---

privilege, are considered "rules of loss distribution and financial protection," which are not covered by Article 3543. La. Civ. Code art. 3543 rev. cmt. a ("This Article applies to "'issues pertaining to standards of conduct and safety' as distinguished from 'issues of loss distribution and financial protection' which are governed by Article 3544 .... By way of illustration, so-called 'rules of the road' establish or pertain to 'standards of conduct and safety', whereas rules that impose a ceiling on the amount of compensatory damages or provide immunity from suit are 'rules of loss distribution and financial protection.'"); *Rigdon v. Tank & Tower Co.*, 682 So.2d 1303, 1306 (La. Ct. App. 1996) (holding that "whether defendants are immune from tort liability, is an issue of loss distribution and financial protection."). Henry does not cite Article 3544 and does not argue that the application of that Article would affect the outcome.

[28]  144 F.3d 1070 (7th Cir. 1998).

[29]  *Id.* at 1074-76.

16

litigation privilege, either qualified or absolute.[30]

In any event, *Steffes* is inapposite because it concerns whether a federal court should apply a state law privilege to federal claims. Here, Henry has not asserted any federal law claims, instead bringing only state law defamation claims. Sitting as an *Erie* court, we must employ the forum state's choice-of-law provisions to determine which state's law applies to the plaintiff's state law claims, including its privileges.[31] Here, the district court, applying Louisiana choice-of-law provisions, concluded that the appropriate state laws for Henry's defamation claims are those of Delaware and Ohio,[32] both of which preclude causes of action against counsel and parties for defamation when a statement is made during the course of a legal proceeding. Because Henry has not argued on appeal that any of the alleged defamatory statements occurred outside the context of a judicial proceeding, we must apply the appropriate state law privilege to Henry's defamation claims.[33] Accordingly, the district court's decision

---

[30] *Id.*

[31] *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 993 (5th Cir. 1999)(applying Texas state law absolute litigation privilege in a diversity jurisdiction suit to plaintiff's Texas state law claims).

[32] The settlement negotiations in the fourth claim also concerned a pending California arbitration. But even if we applied California law, California law recognizes an absolute litigation privilege. *Albertson v. Raboff*, 295 P.2d 405, 408 (Cal. 1956).

[33] Any argument that the Sarbanes-Oxley Act applies to our case is also misplaced. This Act, passed in 2002, makes it a

17

dismissing Henry's first defamation claim and granting summary judgment in favor of Cisco on the others is affirmed.

### III.  Conclusion

Because Henry's fraudulent inducement claim is barred by prescription and because an absolute litigation privilege applies to each of Henry's defamation claims, we affirm the decision of the district court dismissing one defamation claim and granting summary judgment as to Henry's remaining claims.

**AFFIRMED.**

---

criminal act for a person to retaliate against another who provided truthful information to a law enforcement officer about the commission or possible commission of a federal offense.  18 U.S.C. § 1513(e).  Henry contends that if we apply the state law absolute litigation privilege to Henry's state law claims, we will be subverting the objectives of this Act and "[c]orporations would have the freedom to retaliate against the whistle blower by unleashing a legion of lawyers with absolute immunity from alleging false statements without the fear of reprisal in the form of a defamation lawsuit of the harmed plaintiff."  Henry Original Brief, at 16.

But Henry's argument is completely without merit.  Even if we could ignore our *Erie* mandate to apply state law, there has never been any accusation that Cisco committed a federal offense that would even implicate the Act.